**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JOHN L.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No.  17 C 7537** |
| **v.** | ) | |
| | ) | **Magistrate Judge Jeffrey Cummings** |
| **NANCY A. BERRYHILL,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Claimant John L. ("Claimant")[1] brings a motion for summary judgment to reverse the
final decision of the Commissioner of Social Security ("Commissioner") that denied Claimant's
claim for a period of disability and Disability Insurance Benefits ("DIBs") under 42 U.S.C. §§
416(i) and 423(d) of the Social Security Act.  The Commissioner has brought a cross-motion for
summary judgment seeking to uphold the Social Security Agency's decision to deny benefits.
The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to
28 U.S.C. § 636(c).  This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. §§
405(g) and 138(c)(3).  For the reasons stated below, Claimant's motion for summary judgment
[10] is granted and the Commissioner's motion for summary judgment [18] is denied.

**I.  BACKGROUND**

    **A.**    **Procedural History**

On March 28, 2012, Claimant filed a Title II application alleging a disability onset date
of December 16, 2010.  (R. 133).  His claim was denied initially on July 27, 2012 and upon

---

[1] Northern District of Illinois Internal Operating Procedure 22 prohibits listing the full name of the Social
Security applicant in an opinion.  Therefore, only the claimant's first name shall be listed in the caption.
Thereafter, we shall refer to Michael B. as Claimant.

reconsideration on December 10, 2012.  (R. 113, 170-72).  On February 27, 2015, an

Administrative Law Judge ("ALJ") issued a written decision denying benefits to Claimant.  (R.

133-57).  The Appeals Council denied review on July 27, 2017, making the ALJ's decision the

Commissioner's final decision.  (R. 1-5).  *Zurawski v. Halter*, 245 F.3d 881, 883 (7th Cir. 2001).

Claimant subsequently filed this action in District Court.

### B.    Medical Evidence

Claimant suffers from sleep apnea, parasomnia,[2] degenerative disc disease of the lumbar

spine, anxiety, a mild cognitive impairment and bilateral hearing loss with tinnitus.  Only

Claimant's parasomnia is relevant to the Court's assessment of the ALJ's decision.

### 1.    Evidence From Claimant's Treatment History

On February 21, 2011, Claimant sought treatment for sleep problems with sleep specialist

Dr. Phyllis Zee.  Claimant told Dr. Zee that he had difficulty falling asleep and staying asleep.

At the time of the consultation, Claimant went to bed between 11p.m. and 2 a.m. but woke up

every two hours, often from hearing sounds "like a sizzle."  (R. 398-99).  Dr. Zee diagnosed

Claimant with "possible exploding head syndrome (except no exploding sound)" and mild

obstructive sleep apnea.[3]  (R. 400).  Claimant told Dr. Zee that he heard sounds when he was

sleepy four to five times a day or when he shifted his attention.  (R. 399).  Dr. Zee noted that

Claimant had received a sleep apnea diagnosis in 2010 and was currently using a CPAP machine

for it.  She added a CPAP pillow to his sleep protocol and encouraged him to take a low dose of

melatonin before bedtime.  (R. 400-01).  Claimant followed up with Dr. Zee one year later on

---

[2] Parasomnia refers to "abnormal things that can happen to people while they sleep, apart from sleep apnea" such as sleepwalking, nightmares, sleep paralysis, sleep terror, or abrupt awakenings during the night.  http://www.sleepfoundation.org/articles/sleep-and-parasomnias (last visited on June12, 2019).

[3] Exploding head syndrome is a parasomnia that involves hearing sounds such as a loud bang or other noise as a person falls asleep.  http://www.sleepeducation.org/sleep-disorders-by-category/parasomnias/exploding-head-syndrome/overview-facts  (last visited June 12, 2019).

February 13, 2012.  He told her that he fell asleep easily but awoke at 4 a.m. with tinnitus and could not go back to sleep.  (R. 403).  Dr. Zee noted that Claimant was using his CPAP machine without problems and that he had only had one episode of exploding head syndrome in the last two months.  (R. 407).

Claimant met with Dr. Vanessa Kim on November 21, 2013 and told her that although he used his CPAP machine daily he was often in bed eight to ten hours with only minimal sleep. (R. 667).  Dr. Kim referred Claimant to a sleep clinic.  Before Claimant was able to comply with Dr. Kim's recommendation, Dr. Carmen Rosario referred Claimant for a neurological exam after he complained to her of "crashing" sounds and "explosions" in his head.  (R. 660).  A brain MRI and a head magnetic resonance angiography ("MRA") were carried out on April 28, 2014, showing early ischemic changes without gross abnormalities.  (R. 512).  On September 3, 2014, neurologist Dr. Rasheed Izad-Yar noted that both tests were "negative" and "unremarkable."  (R. 728).  Dr. Izad-Yar stated that no tests or treatment exist for exploding head syndrome and that he suspected that Claimant's complaints were hypochondriacal in nature "given [his] multiple complaints spanning multiple organ systems and frequent self-referrals for evaluations."  (R. 729).

Claimant expanded his complaints about exploding head syndrome on August 1, 2014 by telling Dr. Elizabeth Apolonio that he was having three to four dozen episodes each week and that his symptoms ranged from a sizzling sound to loud explosions.  (R. 811). Claimant told Dr. Ward on September 11, 2014 that he had experienced five to six explosive sounds that day and that he woke up every hour from it.  (R. 803).  On October 2, 2014, Claimant met with Dr. James Wyatt at the Rush Hospital Sleep Disorder Clinic.  Dr. Wyatt prescribed a routine during which Claimant would go to bed at 4 a.m. for the first week and arise at noon every day "regardless of

how you slept that night." Claimant was then to sit near a window or go outside for an hour between noon and 2 p.m. (R. 972).

In addition to treatment for exploding head syndrome, Claimant also pursued a range of treatments for other conditions. Claimant complained of cognitive difficulties. Neurologist Dr. Darren Gitelman stated on August 4, 2011 that he had "a mild deficit" in some aspects of his memory and "very subtle difficulties" in attention and executive functions. (R. 440). Dr. Eric Brehem, however, determined on September 15, 2011 that no cognitive dysfunction existed and that Claimant's perception that it did could be attributed to his sleep disorder, environmental distractions, or his heightened awareness that sleep problems may cause cognitive difficulties. (R. 451).

### 2. Evidence From the State Agency Consultants

On June 12, 2012, psychologist Dr. Robert Neufeld examined Claimant on behalf of the Social Security Administration and issued a report. Dr. Neufeld noted that Claimant was cooperative and had normal affect. He could remember eight digits forward and five digits in reverse with no problem in accessing "personally meaningful remote memory items." Dr. Neufeld determined that Claimant had a mild anxiety disorder that was focused on his current life situation. (R. 387-89).

State agency expert Dr. Young-Ja Kim found on July 26, 2012 that Claimant suffered from the severe impairments of hearing loss and an anxiety disorder. Dr. Kim did not find that these impairments imposed any limitations on Claimant's physical abilities but stated that restrictions were required on his ability to hear and to work with hazards such as machinery and working at heights. (R. 105-08). Psychological expert Dr. Donna Hudspeth issued a separate report on June 21, 2012 finding that Claimant suffered from an affective disorder and an organic

mental disorder.  (R. 120).  Dr. Hudspeth stated that these impairments imposed a mild restriction on Claimant's activities of daily living ("ADLs") and moderate restrictions on his social functioning and ability to maintain concentration, persistence, or pace.  (R. 120).

Psychologist Dr. Angelica Ortiz examined Claimant on September 5, 2013 and issued a report.  Dr. Ortiz noted that Claimant had experienced a significant amount of stress following his son's suicide in 2006 though the panic attacks that he experienced at that time had since abated.  (R. 463).  He displayed a broad affect during the examination and showed no evidence of hallucinations or delusions.  Claimant could repeat five digits forward and three backward. Tests that Dr. Ortiz applied during the examination showed that Claimant had above-average normal intellectual functioning.  Unlike Dr. Neufeld, however, Dr. Ortiz determined that Claimant had a poor ability to recall past memories.  Dr. Ortiz concluded that Claimant suffered from an anxiety disorder that imposed, at most, mild restrictions on his ability to carry out complex instructions and make judgments about complex work problems.  Claimant had no limitations in his ability to interact with supervisors, co-workers, or the public.  (R. 462-69).

On her own motion, the ALJ also submitted interrogatories to non-examining psychological expert Dr. Mark Oberlander.  On January 5, 2015, Dr. Oberlander issued his opinion concerning Claimant's ability to carry out work-related tasks.  He found that Claimant suffered from an anxiety disorder and an organic mental disorder that included sleep apnea, tinnitus, parasomnia, and a mild cognitive impairment.  (R. 979).  Dr. Oberlander determined that Claimant had no restrictions in understanding simple instructions, had mild limitations in carrying out complex instructions, and had a moderate restriction in making complex work-related decisions.  Claimant had a mild limitation in interacting appropriately with supervisors but had no other restrictions in dealing with the public or co-workers.  (R. 975-77).

### C. Evidence From Claimant's Testimony

Claimant appeared at a November 12, 2013 hearing that the ALJ held after noting that Claimant intended to appear without counsel or a non-attorney representative. The ALJ advised Claimant of his right to representation and delayed the hearing to give him an opportunity to obtain counsel. The ALJ also requested additional documents from the Veterans Administration ("VA") and Northwestern Hospital on Claimant's behalf. (R. 92-97). A brief second hearing was held on April 22, 2014. The ALJ continued that hearing, however, to permit Claimant to complete medical tests that had already been scheduled at the VA clinic and to give him additional time to find an attorney to represent him. (R. 80-81).

Claimant appeared at the third hearing on October 9, 2014 without counsel. He stated that he had contacted an attorney who declined to represent him and that he wished to proceed without counsel. Claimant testified about his exploding head syndrome by telling the ALJ that when he was sleepy he heard explosions in his head up to 30 times an hour or more. (R. 30). Claimant described the sound as like a shotgun that wakes him up. He also hears explosions when he shifts his focus while concentrating on something. (R. 31). He wakes up ten times a night. (R. 46). Claimant told the ALJ that one doctor had prescribed a blood pressure medication to treat his symptoms but he was unable to take it until he completed his sleep therapy. (R. 32-33). Claimant goes to bed at 4 a.m. and rises at noon, sits by a window for an hour, then eats breakfast. (R. 38).

### D. The Medical and Vocational Experts' Testimony

Medical expert Dr. Ronald Semerdjian also testified at the October 2014 hearing. Dr. Semerdjian described exploding head syndrome (which he called "exploding headaches") was

rare and placed it in the same category as migraine headaches. (R. 55). Based on Claimant's

May 2014 hip x-ray, Dr. Semerdjian testified that he would be limited to sedentary work. (R.

61).

Vocational expert ("VE") Linda Gels was also present at the hearing. The ALJ asked her

if a hypothetical person with Claimant's RFC could carry out his past work as a document

preparer. The VE testified that such a person would be able to perform that task as it is described

in the Dictionary of Occupation Titles.[4] (R. 70-72).

### E.     The ALJ's Decision

On February 27, 2015, the ALJ issued a decision finding that Claimant was not disabled.

Applying the five-step sequential evaluation that governs disability decisions, the ALJ found at

Step 1 that Claimant had not engaged in substantial gainful activity from his alleged onset date of

December 16, 2010 through his last insured date of September 30, 2014. (R. 135). Claimant's

severe impairments at Step 2 were obstructive sleep apnea/parasomnia, degenerative disc disease

of the lumbar spine, generalized anxiety disorder, a mild cognitive impairment secondary to

sleep apnea, and bilateral hearing loss with tinnitus. (R. 135). The ALJ applied the "special

technique" that was formerly set out in 20 C.F.R. § 404.1520a to evaluate the severity of a

claimant's mental impairment.[5] She determined that Claimant had mild restrictions in his

---

[4] "The Dictionary, published by the Department of Labor, gives detailed physical requirements for a variety of jobs. The Social Security Administration has taken 'administrative notice' of the DOT." *Prochaska v. Barnhart*, 454 F.3d 731, 735 (7th Cir. 2006) (citing 20 C.F.R. § 416.966(d)(1)). The DOT was last revised in 1991 and has been criticized as "outdated." *Chavez v. Berryhill*, 895 F.3d 962, 965 (7th Cir. 2018). The Social Security Agency will replace the DOT in 2020 with an Occupational Information System. *Id*.

[5] Because the ALJ issued her decision in 2015, she correctly applied the factors that governed a special technique analysis at that time – the "Paragraph B" factors under listing 12.00 that are used to assess the severity of a mental impairment. That included an assessment of the claimant's (1) activities of daily living, (2) social functioning, (3) ability to maintain concentration, persistence, or pace, and (4) episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3) (2015). The Paragraph B factors have subsequently been amended to include a claimant's capacity for (1) understanding, remembering, or applying

activities of daily living ("ADLs") and social functioning and a moderate limitation in concentration, pace, or persistence. Claimant had experienced no episodes of decompensation. (R. 137-38). None of Claimant's impairments met or medically equaled a listing at Step 3.

Before moving to Step 4, the ALJ found that Claimant's testimony about the limitations imposed by his symptoms was not entirely credible.[6] She also assessed Claimant's RFC by finding that he could perform sedentary work as that term is defined by 20 C.F.R. § 404.1567(a). The ALJ imposed a number of additional restrictions to that finding. Claimant could only perform "occasional postural activities" such as balancing, stooping, or climbing ramps and stairs and could never climb ladders, ropes, or scaffolds. The ALJ accommodated limits in Claimant's ability to hear by restricting him to no more than "frequent hearing requirements" with nothing more than moderate noise levels. (R. 139). Claimant could have concentrated exposure to hazards or wet surfaces and was limited to "simple, routine and repetitive work tasks with no strict production quotas and few if any changes in the work setting." (R. 139).

Based on the VE's testimony, the ALJ determined at Step 4 that Claimant could perform his past relevant work as a document preparer. (R. 156). Since that finding required the ALJ to determine that Claimant was not disabled, she did not proceed to Step 5.

---

information, (2) interacting with others, (3) concentrating, persisting, and maintaining pace, and (4) adapting and managing oneself. *See* 81 Fed.Reg. 66,138 (Sept. 26, 2016).

[6] At the time of the ALJ's decision, SSR 96-7p required an ALJ to assess a claimant's credibility. SSR 96-7p was superseded on March 27, 2017 by SSR 16-3p which eliminates the use of the term "credibility." The ALJ will be required to apply SSR 16-3p on remand. *Mendenhall v. Colvin*, No. 3:14-C-3389, 2016 WL 4250214, at *5 (C.D.Ill. Aug. 10, 2016). Social Security Rulings "are interpretive rules intended to offer guidance to agency adjudicators." *Lauer v. Apfel*, 169 F.3d 489, 492 (7th Cir. 1999). They do not have the force of law or a regulation, though they are binding on the SSA. *Id.*

## II. LEGAL ANALYSIS

### A.    The Social Security Administration Standard

In order to qualify for disability benefits, a claimant must demonstrate that he is disabled. An individual does so by showing that he cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 4243(d)(1)(A). Gainful activity is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

The Social Security Administration ("SSA") applies a five-step analysis to disability claims. 20 C.F.R. § 404.1520. The SSA first considers whether the claimant has engaged in substantial gainful activity during the claimed period of disability. 20 C.F.R. § 404.1520(a)(4)(i). It then determines at step two whether the claimant's physical or mental impairment is severe and meets the twelve-month duration requirement noted above. 20 C.F.R. § 404.1520(a)(4)(ii). At step three, the SSA compares the impairment or combination of impairments found at step two to a list of impairments identified in the regulations ("the listings"). The specific criteria that must be met to satisfy a listing are described in Appendix 1 of the regulations. 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairments meet or "medically equal" a listing, the individual is considered to be disabled, and the analysis concludes. If the listing is not met, the analysis proceeds to step four. 20 C.F.R. § 404.1520(a)(4)(iii).

Before addressing the fourth step, the SSA must assess a claimant's residual functional capacity ("RFC"), which defines his or her exertional and non-exertional capacity to work. The

SSA then determines at step four whether the claimant is able to engage in any of his past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can do so, he is not disabled. *Id*. If the claimant cannot undertake her past work, the SSA proceeds to step five to determine whether a substantial number of jobs exist that the claimant can perform in light of her RFC, age, education, and work experience. An individual is not disabled if he or she can do work that is available under this standard. 20 C.F.R. § 404.1520(a)(4)(v).

### B. Standard of Review

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C. § 405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence "means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019), *quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1983). A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts or by making independent symptom evaluations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413 (citation omitted).

## III. DISCUSSION

Claimant argues that the ALJ's decision requires remand because the ALJ failed to obtain a proper waiver of counsel from him before proceeding with the administrative hearing. The Court addresses that claim in full below. Claimant also argues that the ALJ erred by (1) finding that his testimony concerning exploding head syndrome was not fully credible, (2) not properly accounting for sleep-related limitations in the RFC, and (3) not including greater RFC restrictions related to his mental impairment and impairments. Because the Court agrees with Claimant's arguments concerning his parasomnia it does not address issues related to his mental and hearing impairments.

### A.      The ALJ Obtained a Proper Waiver of Counsel from Claimant

A social security claimant has a statutory right to be represented by an attorney at an administrative hearing. A claimant can waive that right if the ALJ explains (1) how an attorney might aid the claimant in the disability proceeding, (2) the possibility that the claimant might obtain free counsel or enter into a contingency-fee agreement, and (3) "the limitation on attorney fees to 25 percent of past due benefits and required court approval of the fees." *Binion v. Shalala*, 13 F.3d 243, 244 (7th Cir. 1994). If the ALJ does not obtain an adequate waiver, the ALJ must "scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts." *Skinner v. Astrue*, 478 F.3d 836, 841-42 (7th Cir. 2007) (citation omitted). The Commissioner bears the burden of showing that the ALJ has carried out this duty if there has not been a valid waiver of counsel. *Million v. Astrue*, 260 Fed.Appx. 918, 921 (7th Cir. 2008).

Claimant signed a waiver of his right to be represented by an attorney at the second hearing held on April 22, 2014. He argues that his waiver was invalid because the ALJ did not explain at that time what an attorney could do to assist him. While the ALJ did not address

Claimant's right to an attorney at the April 2014 hearing, she discussed the matter at the first

hearing on November 12, 2013. The ALJ told Claimant that he had the right to be represented,

explained how an attorney could assist him, and discussed free or contingency-fee

representation. (R. 91-93). However, the ALJ did not explain to Claimant that attorney's fees

were limited to 25 percent of any past due benefits that Claimant might be owed. An ALJ's

failure to address that issue invalidates a disability applicant's waiver of counsel. *See Binion*, 13

F.3d at 244; *Wirth v. Barnhart*, 318 F.Supp.2d 726, 740 (E.D.Wis. 2004) ("Because the ALJ did

not specifically explain the twenty-five percent limitation on attorney's fees to the plaintiff, she

was not 'properly informed," [sic] of her right to counsel, and therefore the waiver of counsel

was not valid.").

However, Claimant also received multiple written copies of a form titled "Your Right to

Representation" that were sent to him by the Social Security Administration. (R. 190, 207, 223).

These forms notified Claimant about the ways in which an attorney could help him in his case,

including an explanation of how counsel could obtain medical records and Social Security files,

assist Claimant with his testimony to the ALJ, and request reconsideration or Appeals Council

review. (R. 190). They also discussed in detail how Claimant could obtain contingency-fee

representation and the limitation of attorney's fees to 25 percent of past-due benefits. (R. 190-

91). Claimant also received a lengthy list of organizations that might be able to assist him if he

could not afford representation. (R. 180-83).

The forms that Claimant received notified him of all the factors required for a proper

waiver of counsel. The fact that Claimant was informed of his rights by mail instead of by the

ALJ herself does not invalidate his waiver. *Josefyk v. Berryhill*, 923 F.3d 492, 497 (7th Cir.

2019) ("[A]s long as it contains the required information, written notice adequately apprises a

claimant of his right to counsel.") (citing cases). In *Josefyk*, an ALJ's failure to inform the claimant of all the factors required by the Seventh Circuit did not invalidate the claimant's wavier of representation when he received forms similar to those in this case that addressed the relevant issues in full. As *Josefyk* stated, written notice is sufficient "especially . . . when the ALJ issues the claimant an oral reminder at the hearing." *Id*. In this case, the ALJ not only reminded Claimant of his right to counsel, she held the first administrative hearing for the sole purpose of doing so. Accordingly, Claimant's signing of a waiver of representation form on October 9, 2014 constituted a valid waiver of his right to be represented. (R. 14).

### B. The ALJ Erroneously Assessed Claimant's Allegations About Parasomnia and Exploding Head Syndrome

Claimant argues that the ALJ failed to account for the parasomnia associated with his exploding head syndrome by improperly finding that his statements about his condition were not entirely credible. Under SSR 96-7p, which governed the ALJ's February 27, 2015 decision, an ALJ was required to assess how an individual's symptoms affected his ability to work when the ALJ determined that a medical impairment exists that could be expected to produce the claimant's alleged condition. An ALJ addresses that issue by considering the claimant's ADLs, allegations of pain or other symptoms, any aggravating factors, the types of treatment received, and any medications the claimant took. *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) (citing SSR 96-7p). The ALJ stated that Claimant's testimony about the limitations that stemmed from his symptoms were "not credible to the extent they are inconsistent with the [RFC] assessment." (R. 141). Claimant argues that the ALJ erred in assessing his testimony related to exploding head syndrome by choosing to "simply dismiss Plaintiff as a hypochondriac." (Dckt. # 11 at p. 12).

The Court disagrees that the ALJ characterized Claimant as a hypochondriac. It is true that neurologist Dr. Rasheed Izard-Yar stated that he "strongly suspect[ed] hypochondriac behavior given multiple complaints spanning multiple organ systems and frequent self-referrals for evaluation" by Claimant. (R. 149). The ALJ cited the neurologist's comment but never adopted it or stated that Claimant only imagined that he was ill or that his alleged symptoms were hypochondriac in nature. She noted instead – correctly – that he had exaggerated some of his symptoms. The ALJ pointed out, for instance, that Claimant testified that he was at risk of esophageal cancer from Barrett's esophagus even though his most recent endoscopic exam did reveal any evidence of Barrett's esophagus.[7] (R. 155; 569, "no [B]arretts"). She also noted that the record did not support Claimant's testimony that he was told by one of his doctors that he needed a hip replacement. (R. 41, 155).

That said, the Court agrees with Claimant that the ALJ did not properly address his sleep disorder, particularly his struggle with exploding head syndrome. The ALJ characterized Claimant's testimony on this issue as a series of "extreme allegations" whose credibility she questioned on multiple grounds. (R. 151). The ALJ began by evaluating Claimant's exploding head syndrome by referring to his sleep apnea, stating that the exploding head symptoms could not be as severe as Claimant alleged because he only suffers from mild obstructive sleep apnea that is controlled with a CPAP device. The ALJ therefore assumed that sleep apnea and exploding head syndrome were related to one another and that the mildness of the first disorder could be used to gauge the severity of the other. In fact, the ALJ combined the two disorders at

---

[7] Barrett's esophagus is a condition in which the esophageal lining is replaced with tissues that resemble the lining of the intestines. Barrett's esophagus increases the risk of developing esophageal cancer. https://www.webmd.com/heartburn-gerd/guide/barretss-esophagus-symptoms-causes-and-treatments#1 (last visited June 12, 2019).

Step 2 to find that "obstructive sleep apnea/para-insomnia" constituted a single severe impairment. (R. 135).

The ALJ did not cite any medical basis for reaching such a conclusion. The ALJ overlooked that testifying medical expert Dr. Semerdjian did not draw any connection between sleep apnea and exploding head syndrome. He testified instead that Claimant's parasomnia should be assessed in relation to migraine headaches, which are evaluated under listing 11.03 for seizure disorders. (R. 55). *See Cooper v. Berryhill*, 244 F.Supp.3d 824, 828 (S.D.Ind. 2017) (stating that migraines are considered under listing 11.03 (epilepsy)). By contrast, sleep apnea is a breathing disorder that is evaluated under listing 3.10 (sleep-related breathing disorders). *Woods v. Colvin*, No. 1:14-C-1220, 2015 WL 5775809, at *11 (S.D.Ind. Sept. 30, 2015). The ALJ herself applied listing 3.10 to sleep apnea at Step 3 without mentioning Claimant's parasomnia, leaving it unclear why she thought the two disorders were connected. (R. 135). Dr. Zee, who treated Claimant for sleep apnea and was the first doctor to identify his exploding head syndrome, never linked Claimant's impairments or stated that one of them was a function of the other. (R. 398-401). Moreover, Dr. Elizabeth Apolonio stated in an October 20, 2014 letter that tests failed to show any connection between exploding head syndrome and Claimant's "respiratory events." (R. 846).

Instead of relying on this medical evidence, therefore, the ALJ drew her own conclusion that Claimant's mild sleep apnea could be used to discount his testimony about exploding head syndrome. That is tantamount to "playing doctor" which courts have repeatedly stated an ALJ may not do. *See*, *e.g.*, *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.");

*Armstrong v. Barnhart*, 287 F.Supp.2d 881, 887 (N.D.Ill. 2003) (explaining that "playing doctor" occurs when an ALJ draws medical conclusions without relying on evidence for it).[8]

The ALJ also criticized Claimant's testimony on the ground that his exploding head symptoms were based on a "subjective allegation" that lacked objective confirmation. (R. 151). In support, the ALJ noted that Claimant said that he had experienced two instances of loud sounds during a 2010 sleep study but that his allegation had not been confirmed by the EEG measurements that were taken as part of the sleep test. (R. 151). The Court is unable to follow what led the ALJ to assume that Claimant's perception of loud noises – which is by definition subjective in nature – *should* be measurable by objective tests. The record clearly refutes such an assumption. Neurologist Dr. Rasheed Izad-Yar stated that "no test exists to diagnose" exploding head syndrome and "there is no treatment for this parasomnia." (R. 729). Moreover, the ALJ herself noted that Dr. Apolonio stated in an October 2014 letter that there was no test for Claimant's condition. (R. 155, 847). Far from being evidence that Claimant was not believable, therefore, the ALJ should have recognized that the absence of objective tests can be a characteristic of the disorder itself. *See* https://www.webmd.com/sleep-disorders/exploding-head syndrome#1 ("Usually, there aren't tests for exploding head syndrome.") (last visited June 9, 2019).

An ALJ is never permitted to disregard a claimant's statements about his symptoms merely because objective tests do not confirm his testimony. *Pierce v. Colvin*, 739 F.3d 1046, 1049-50 (7th Cir. 2014) ("An ALJ may not discount a claimant's credibility just because her claims . . . are unsupported by significant physical and diagnostic examination results."). The absence of objective tests requires an ALJ to consider other factors such as the claimant's ADLs,

---

[8] The Court emphasizes that it does not find that the ALJ erred by linking sleep apnea to exploding head syndrome. Rather, the ALJ erred by failing to cite any medical evidence for her conclusion.

the factors that aggravate his condition, and the functional restrictions that stem from the claimant's impairment. *See* SSR 16-3p, 2017 WL 5180405, at *6-7. The ALJ attempted to follow this directive by addressing the conditions that made Claimant's exploding head symptoms worse. She stated that Claimant testified that changes in his physical posture triggered loud noises in his head, credited Claimant's supposed statement, and included an RFC accommodation for only "occasional postural changes." (R. 150). The problem with this is that Claimant never told the ALJ that postural changes made his condition worse; rather, he testified that sleepiness and changes in his mental focus could trigger loud noises in his head. (R. 31, "Yeah, it's all about shifting focus on whatever I'm doing."). Claimant made similar statements to Dr. Zee by telling her that he heard odd noises when he was sleepy, when he awakened during the night to go to the bathroom, or when he experienced "shifts in attention/concentration during the daytime (*without a change in position*)." (R. 399) (emphasis added). The ALJ therefore erred by crediting a claim that Claimant did not make and by failing to evaluate the exacerbating factor that he actually testified to.

The ALJ also considered the frequency and intensity of Claimant's symptoms. That was a crucial issue in this case because Claimant told the ALJ that he heard "sizzles" or explosions up to 30 times an hour when he was sleepy. (R. 30). Citing no part of the record, the ALJ rejected Claimant's account because he allegedly told his doctors that the explosions in his head had decreased from four to five times daily to only once every few months. (R. 151). The ALJ may have intended to refer to Dr. Zee's treatment notes which show that claimant stated in February 2011 that he had four to five episodes of exploding head syndrome each day. (R. 339). One year later he told Dr. Zee that his symptoms had reduced to one in the last month. (R. 407). Claimant testified, however, that his symptoms had become worse by the time of the

administrative hearing.  (R. 30, stating that explosions "happen a lot more frequently than they used to").  The record supports that allegation because by August 2014 Claimant reported that he was having three to four *dozen* episodes of exploding head syndrome each week with five to six on September 3, 2014 alone.  (R. 803, 811).  The ALJ overlooked that part of the record.  She therefore had no basis for rejecting Claimant's description of the frequency of his symptoms without accounting for all the evidence from 2011, 2012, and 2014.

Even if episodes of exploding head syndrome did not increase in a linear fashion, the ALJ should have considered the possibility that they fluctuated from time to time.  Such changes in frequency are characteristic of exploding head syndrome.  *See* http://sleepeducation.org/sleep-disorders-by-category/parasomnias/exploding-head-syndrome/overview-facts ("The number of attacks varies.  They can happen very rarely.  They can also occur many times a night. . . . Then a few weeks or months will pass before it occurs again.") (last visited June 9, 2019).  The ALJ was not required to know that fact, but she was obligated to investigate the possibility that the frequency of Claimant's experiences might change over time.  *See Fisher v. Berryhill*, 760 Fed.Appx. 471, 477 (7th Cir. 2019) (stating that the failure to address fluctuations in symptoms constitutes "a serious flaw").  The ALJ could easily have done so by asking medical expert Dr. Semerdjian at the hearing if such fluctuations should be expected for exploding head syndrome. Without seeking guidance on this topic, the ALJ had no medical expertise for concluding that Claimant's symptoms were less severe than he claimed based on their frequency at a specific point in time.  *See Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990) ("The medical expertise of the Social Security Administration is reflected in regulations; it is not the birthright of the lawyers who apply them.").

The ALJ next criticized Claimant's description of his exploding head syndrome because he did not have any "extreme functional limitations" such as dementia or severe cognitive impairments.  (R. 151).  In support, the ALJ cited an actigraphy report from September and October 2014 indicating that Claimant was not sleep deprived and had a normal sleep onset.[9]  The actigraphy test was carried out as part of Claimant's treatment with sleep specialist Dr. James Wyatt.  It showed that Claimant had an average sleep latency period of 15 minutes and that his average time asleep was 7.19 hours a night.  (R. 958).

The ALJ's discussion of Claimant's functional limitations is erroneous on two grounds.  First, the ALJ did not address why Claimant was less believable because he did not have a debilitating condition like dementia.  The ALJ did not cite any medical evidence suggesting that dementia was a possible outcome of exploding head syndrome.  In addition, Claimant never told the ALJ that he suffered from dementia, thereby making it unclear why she thought he was less believable because he had not experienced such a dire result.  Even if dementia were a possible outcome for someone suffering from exploding head syndrome, a disability applicant does not have to experience the worst possible result of an impairment in order to be believed.  *Cf. Williams v. Colvin*, No. 15 C 7011, 2016 WL 6248181, at *11 (N.D.Ill. Oct. 25, 2016) ("Claimants . . . do no necessarily have to undergo worst-case treatment scenarios . . . in order to be credible.") (addressing psychiatric disorders).  An ALJ's task is to assess whether the record supports the limitations an applicant claims he has, not to discount his statements because he does not have a condition he does not allege.

---

[9] An actigraphy test records muscle movements in order to determine sleep patterns such as sleep onset. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3109647 (last visited June 8, 2019).  Sleep onset, or sleep latency, "is the amount of time it takes to fall asleep after the lights have been turned off." https://www.verywellhealth.com/sleep-latency-3014920 (last visited June 9, 2019).

Second, the ALJ's account of Claimant's actigraphy test fails to address the facts surrounding Claimant's sleep regimen. It is true that Claimant went to sleep quickly and stayed asleep for normal periods. He did so, however, by adopting a sleep schedule that the ALJ characterized as "odd." (R. 137). The actigraphy report shows that during the last week of September 2014 Claimant went to bed anywhere from 2:11 a.m. to 4:26 a.m. and slept until 11:33 a.m. at the earliest to 1:57 p.m. at the latest. (R. 964). Moreover, Claimant told the ALJ that after he manages to arise he sits by a window for sunlight therapy and only then showers and eats breakfast – a process that takes two hours and was prescribed to him by Dr. Wyatt as part of his sleep therapy. (R. 38, 972, "If possible, sit very near a window, or go outside, for an hour, in the 12PM (Noon) to 2PM time period.").

The ALJ failed to build any bridge between this sleep schedule and her conclusion that the actigraphy report supported a finding that Claimant was less limited than he claimed. Far from contradicting Claimant's testimony, the report confirmed almost everything that Claimant described to the ALJ about his sleep habits. Claimant's sleep schedule was also more than "odd," as the ALJ described it. Although he fell asleep and stayed asleep within normal limits, Claimant did so under a doctor-prescribed schedule that kept him from starting most daily activities until 2 p.m. – over half of what would constitute a normal workday for a person who works from 9 a.m. to 5 p.m. The ALJ made no effort to explain how that could be reconciled with her finding that exploding head syndrome did not impose "extreme functional limitations." (R. 150). Remand is therefore required so that the ALJ can reconsider the evaluation of Claimant's symptoms and build a bridge between the record and her conclusion. [10]

---

[10] The ALJ also addressed Claimant's ADLs as part of her analysis. The Court does not consider that analysis because most of what she stated related to Claimant's physical restrictions. However, the ALJ should reconsider her reasoning on remand. She stated, for example, that Claimant could help with washing dishes and go grocery shopping. In reality, Claimant's wife stated that she did most of the

### C.  The ALJ Failed to Account for Claimant's Parasomnia in the RFC Assessment

Claimant also argues that the ALJ erred by not including restrictions in the RFC that accommodated the sleep problems created by his exploding head syndrome.  The RFC addresses the maximum work-related activities that a claimant can perform despite the limitations that stem from his or her impairments.  *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).  The task of assessing a claimant's RFC is reserved to the Commissioner instead of to a medical expert. *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995).  "In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do."  *Id*.  Such evidence includes the claimant's medical history; the effects of treatments that he or she has undergone; the reports of activities of daily living ("ADL"); medical source statements; and the effects of the claimant's symptoms.  SSR 96-8p, 1996 WL 374184, at *5 (July 2, 1996).

The RFC must accommodate all of a claimant's limitations that are supported by the record.  *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015).  In addition, an ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)."  SSR 96-8p, 1996 WL 374184, at *7.  That includes an explanation of why the

---

housework, including the dishes.  (R. 43, "I know he can't wash dishes, so I pretty kind of do a lot of things.  It's very annoying.").  It is true that Claimant told the ALJ that he goes grocery shopping but the store is only six blocks away from his house and Claimant has to use a cart in the store.  (R. 42).  *See Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013) ("We have repeatedly cautioned that a person's ability to perform daily activities, especially if that can be done with significant limitations, does not necessarily translate into an ability to work full-time.") (citing cases).  Moreover, the ALJ concluded that it was difficult to attribute Claimant's ADL limitations to his medical condition "as opposed to other reasons." (R. 154).  The ALJ is directed to clarify what "other reasons" have affected Claimant's functioning.

claimant is able "to perform sustained work activities in an ordinary work setting on a regular and continuing basis" eight hours a day for five days a week. *Id*.

The Court agrees that the ALJ failed to account for Claimant's exploding head syndrome in the RFC assessment. As noted earlier, *supra* at p.17, the ALJ included an RFC restriction for "occasional postural changes" because she mistakenly thought that Claimant had stated that changes in his physical position triggered exploding head symptoms. In fact, Claimant told the ALJ that changes in his mental focus exacerbated his condition. That claim was consistent with the description of his condition that Claimant gave to treating physician Dr. Zee. (R. 399). The ALJ therefore credited something that Claimant did not allege but failed to evaluate the evidence that was relevant to his condition. That requires remand so that the ALJ can either revise the RFC or explain why no RFC accommodation is required on this issue.

Second, and more fundamentally, the ALJ never explained how Claimant could carry out a normal workday if he arose at noon and sat by a window for an hour as Dr. Wyatt instructed him to do. Even assuming that Claimant had the ability to perform sedentary work eight hours a day, the ALJ did not inquire into, or include a restriction for, *when* his workday should begin. Claimant's sleep schedule required the ALJ to do one of two things: (1) explain why Claimant was capable of getting to work at a normal start time on a regular basis despite his parasomnia or (2) ask the VE what jobs were available to a person who sleeps until noon and does not leave his home for up to two hours later. *See Stewart v. Astrue*, 561 F.3d 679, 684-85 (7th Cir. 2009) (stating that an ALJ is obligated to include all of a claimant's restrictions that are supported by the record in hypothetical questions to the VE). Having done neither of these things, the ALJ failed to explain the basis for her RFC assessment or to support her finding at Step 4 that Claimant could perform his past relevant work.

The Court recognizes that Dr. Wyatt's October 2014 sleep prescription to Claimant post-dated his last insured date of September 30, 2014. (R. 972). That does not make it irrelevant, however, and the ALJ did not suggest that it was. See *Halverson v. Heckler*, 743 F.2d 1221, 1225 (7th Cir. 1984) ("There can be no doubt that medical evidence from a time subsequent to a certain period is relevant to a determination of a claimant's condition during that period."). Even if Dr. Wyatt's sleep-therapy schedule was not relevant, however, the record shows that Claimant's sleep patterns were disrupted throughout his alleged disability period. Dr. Zee's initial consultation report of February 21, 2011 states that Claimant's bed time varied from 10:30 p.m. to 2 a.m. and his wake time varied 6:30 a.m. to 11:30 a.m. (R. 398). Claimant told neurologist Dr. Gitelman on October 4, 2011 that he went to bed at 2 a.m. and rose at 11 a.m. (R. 438). On December 19, 2013, he complained to Dr. Carmen Rosario that he went to bed at 2 a.m., was asleep by 3 a.m., and rose at 11:30 a.m. (R. 600). Although the record shows that Claimant was capable of a relatively normal sleep schedule at times, severe disruptions in his ability to sleep and wake up recurred throughout the disability period. The ALJ was required to account for the effect such problems might have on his ability to work. Remand is therefore required so that the ALJ can explain more carefully why Claimant has the RFC to perform his past relevant work as a document preparer.

### D.    Other Issues

In addition to the credibility and RFC issues, Claimant's exploding head syndrome also gave rise to another source of confusion that neither party has addressed. The ALJ assigned great weight to the testimony of medical expert Dr. Semerdjian and to a report issued by psychological expert Dr. Oberlander. The ALJ failed to note that these experts gave conflicting assessments of Claimant's exploding head syndrome. Dr. Semerdjian – an internal medicine

specialist who repeatedly misidentified Claimant's condition as "exploding headache syndrome" – testified that the listings do not include an entry for "exploding headache." (R. 55). When the listings do not address a claimant's condition, the ALJ must consider whether the claimant's symptoms are medically equal to the listing that is "most closely related" to those symptoms. *Fox v. Heckler*, 776 F.2d 738, 740 (7th Cir. 1985). Dr. Semerdjian testified that "exploding headache" is closest in nature to migraine headaches which, in turn, are considered under the listing for seizure disorders.[11] *See Cooper*, 244 F.Supp.3d at 828 (stating that migraines are considered under listing 11.03 (epilepsy)). That strongly suggests that Dr. Semerdjian believed that exploding head syndrome was a physical impairment because seizure disorders are considered under general category of listing 11.00 (neurological) and not under listing 12.00 (mental disorders).

By contrast, Dr. Oberlander concluded that exploding head syndrome was a psychological disorder. The ALJ submitted medical interrogatories to Dr. Oberlander because she thought that Claimant's parasomnia involved "a possible psychological component." (R. 139). Dr. Oberlander did not address that issue directly but he agreed that Claimant's parasomnia – as well as tinnitus and sleep apnea – were all psychological impairments that should be evaluated under listing 12.02 (organic mental disorders). (R. 979).

The ALJ failed to address the problems that stem from her acceptance of Dr. Oberlander's conclusion. Dr. Oberlander's finding contradicts Dr. Semerdjian's testimony that Claimant's condition was most closely related to a neurological problem that should be evaluated

---

[11] The ALJ will be required on remand to consider that Claimant testified that his exploding head symptoms did *not* involve headaches. (R. 29). *See* https://www.webmd.com/sleep-disorders/exploding-head syndrome#1 ("Although its name is very vivid, exploding head syndrome isn't painful."). Nor did any medical treater suggest that exploding head syndrome was related to a seizure disorder. To the contrary, Claimant experienced exploding sounds during a 2010 sleep study that were found to be unrelated to "epileptiform discharges." (R. 400).

under listing 11.03.   In addition, the ALJ cited no evidence for a conclusion that Claimant

suffered from an organic mental disorder.  Listing 12.02 defines organic mental disorders as

"psychological or behavioral abnormalities associated with a dysfunction of the brain."  20

C.F.R. Pt. 404, Subpt. P, App. 1, § 12.02.  The listing also requires a "[h]istory and physical

examination or laboratory tests [that] demonstrate the presence of a specific organic factor

judged to be etiologically related to the abnormal mental state."  *Id*.  The ALJ never identified

what brain dysfunction Claimant had.  Nor did she or Dr. Oberlander cite any tests that show a

"specific organic factor" that caused Claimant's exploding head syndrome.[12]  None of

Claimant's treaters reached that conclusion, and the objective tests of Claimant's brain

demonstrated no deficiency.  An August 2011 brain MRI was normal as were a November 2013

MRI and MRA of Claimant's brain.  (R. 450, 613-15).  Dr. Semerdjian noted some ischemic

changes in the brain MRA but stated that they were not unusual or "significant clinically."  (R.

54).  A 2010 sleep study also showed that Claimant's experience of exploding sounds was not

related to any "epileptiform discharges."  (R. 400).  Indeed, the ALJ concluded that except for

some unrelated bloodwork all of Claimant's medical tests – which she accurately described as "a

lot" – showed that "everything was normal."  (R. 149).

  As the record currently stands, therefore, it is not clear to the Court if anyone – Dr.

Semerdjian, Dr. Oberlander, or the ALJ – accurately characterized Claimant's exploding head

syndrome.  According to the American Academy of Sleep Medicine, one of several different

problems may be the source of the disorder.  *See* http://sleepeducation.org/sleep-disorders-by-

category/parasomnias/exploding-head-syndrome/symptoms-risk-factors (stating that exploding

---

[12] Dr. Oberlander's report refers to Dr. Zee's September 3, 2014 which, in turn, only cites the 2010 EEG
test "per report" that the ALJ said did not contain "objective findings."  (R. 151, 726).  Dr. Oberlander
also referred to Dr. Apolonio's October 20, 2014 letter stating that no test exists for exploding head
syndrome.  (R. 846-47).

head syndrome may be caused by another sleep disorder, a medical condition, medication, a mental health problem, or by substance abuse) (last visited June 12, 2019).  The ALJ did not have to ferret out the true source of Claimant's disorder, but she was obligated to resolve the conflict between the Dr. Semerdjian's and Dr. Oberlander's assessments of the issue.  *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) ("Weighing conflicting evidence from medical experts, however, is exactly what the ALJ is required to do.").  Without doing so, the ALJ could not draw any inferences from these experts' statements about Claimant's impairment or the restrictions that were related to it.

## IV. CONCLUSION

For the reasons stated above, plaintiff's motion for summary judgment [10] is granted. The Commissioner's cross-motion for summary judgment [18] is denied.  The decision of the Commissioner is reversed, and the case is remanded for further proceedings consistent with this Memorandum Opinion and Order.  On remand, the ALJ shall (1) re-evaluate Claimant's symptom testimony related to exploding head syndrome, including a re-evaluation of his ADLs, (2) reassess the reasons that support the RFC assessment, (3) explain what evidence supports a finding that Claimant suffers from an organic mental disorder, and (4) reconsider her evaluation of Dr. Semerdjian's testimony and Dr. Oberlander's report and resolve the conflict between their assessments of Claimant's parasomnia.  As part of the last requirement, the ALJ is to explain what listing should be considered in evaluating the severity of Claimant's exploding head syndrome and address that issue at Step 3.

_____
**Hon. Jeffrey Cummings**
**United States Magistrate Judge**

**Dated:  June 25, 2019**